**UNITED STATES, Appellee,**

v.

**Clarence R. QUILLEN, Specialist Four
U.S. Army, Appellant.**

No. 56,616.

CM 447423.

U.S. Court of Military Appeals.

Dec. 6, 1988.

For Appellant: *Captain Richard J. Anderson* (argued); *Major Dale K. Marvin* (on brief); *Colonel Brooks B. La Grua, Lieutenant Colonel Paul J. Luedtke, Captain James E. O'Hare.*

For Appellee: *Major Byron J. Braun* (argued); *Colonel Norman G. Cooper* (on brief); *Lieutenant Colonel Gary F. Roberson.*

---

*Opinion of the Court*

SULLIVAN, Judge:

In April 1985, appellant was tried by a general court-martial composed of officer and enlisted members at Fort Lewis, Washington. Contrary to his pleas, he was found guilty of attempted larceny of property of the Army and Air Force Exchange Service (AAFES), in violation of Article 80, Uniform Code of Military Justice, 10 USC § 880. He was sentenced to a bad-conduct discharge, confinement for 1 year, and reduction to the lowest enlisted grade. The convening authority approved the sentence, and the Court of Military Review affirmed on September 26, 1986.

This Court granted review of the following issues:

## I

WHETHER THE MILITARY JUDGE ERRED IN RULING THAT EVIDENCE OF APPELLANT'S GOOD MILITARY CHARACTER WAS NOT ADMISSIBLE BEFORE FINDINGS.

## II (SPECIFIED)

WHETHER THE MILITARY JUDGE ERRED BY ADMITTING INTO EVIDENCE STATEMENTS GIVEN BY APPELLANT TO A STORE DETECTIVE OF THE POST EXCHANGE, WHEN THE DETECTIVE DID NOT ADVISE APPELLANT OF EITHER HIS ARTICLE 31 OR HIS TEMPIA[1] RIGHTS.

We hold that this base-exchange detective should have advised appellant of his rights under Article 31(b), UCMJ, 10 USC § 831(b), prior to questioning him about this suspected shoplifting offense. *United States v. Penn*, 18 USCMA 194, 39 CMR 194 (1969); *see generally United States v. Duga*, 10 MJ 206 (CMA 1981). Accordingly, the military judge erred in finding the detective's testimony as to appellant's unwarned responses was admissible. *See* Art. 31(d).

On December 16, 1984, Mrs. Holmes was working as an exchange detective at the McChord Air Force Base Exchange. She observed appellant pushing a shopping cart that contained a Beta movie camera and a video cassette recorder. She further observed that these items did not have security tape on them. Continuing her surveillance, she saw him apply something to the boxes with a glue pencil. Thereafter, she noticed that both boxes displayed a yellow-green security tape instead of the current day's color, which was pink.

Mrs. Holmes, her suspicions aroused, followed appellant throughout the store observing his subsequent actions. She then arranged for appellant to be provided the opportunity to depart the exchange without purchasing the items in his shopping cart. When appellant did so, she stopped him and displayed her "badge." Mrs. Holmes then requested appellant's military identification card, which he voluntarily surrendered. Mrs. Holmes and an assistant exchange detective, Mrs. Thuer, then escorted appellant to the manager's office.

At that office Mrs. Holmes asked appellant if he had a receipt for the merchandise. He said, "No, I think I must have lost it. I was in here earlier today and purchased it then..." He responded to more particular questions from her by stating that he had purchased the video equipment at the stereo department, but he could not find his receipt. Mrs. Holmes called the Air Force Security Police, checked with the stereo department, and determined that no sale of this merchandise had occurred that day. Returning to the office, Mrs. Holmes waited with appellant until Sergeant Franks, Air Force Security Police, arrived.

Mrs. Holmes then told Sergeant Franks what she had observed and what appellant had told her. Sergeant Franks then apprehended appellant and read appellant his Article 31 rights. After these rights were given, Mrs. Holmes again asked appellant if he had purchased the video equipment or had receipts for them. Appellant again responded that he had purchased the items from the stereo department.

At trial, appellant moved to suppress the statements made to Mrs. Holmes on the grounds that she failed to read him his Article 31 rights prior to questioning. Moreover, appellant argued that his statements to Mrs. Holmes made after being given his Article 31 rights should also be suppressed.

The military judge thereafter made the following ruling:

> Mrs. Holmes was a store detective unrelated to direct law enforcement activities or representing the commander's punitive or disciplinary power and, therefore, she was not acting in an official capacity when she first asked the accused for a receipt and where he had purchased the items in question.

1. *United States v. Tempia*, 16 USCMA 629, 37 CMR 249 (1967).

Therefore, as to the first statement made by the accused, the motion to suppress is denied. As to the subsequent questioning by Mrs. Holmes after the accused invoked his rights to counsel, the motion is granted as to what he told her.

----------

▮ The specified issue in this case questions admissibility of testimony from Mrs. Holmes' repeating appellant's responses to her questions about the suspected stolen items. See Art. 31(d); Mil. R. Evid. 304(a), Manual for Courts-Martial, United States, 1984. Appellant at trial and again on appeal asserts that this exchange detective was required to advise him of his rights under Article 31 before questioning him about the shoplifting incident. See Art. 31(b); Mil. R. Evid. 305(c). The Court of Military Review held that such warnings were not required because "the store detective acted not as an instrument of the military with investigative or law enforcement powers, but in a private capacity as an employee of AAFES when she interrogated appellant." Unpub. op. at 1. We disagree.

Admittedly, Mrs. Holmes was a civilian and was not subject to the Uniform Code of Military Justice. However, it is well established that these facts alone do not render inapplicable the protections of Article 31(b) to such a person's questioning of a servicemember about a suspected crime. This Court has noted "at least two situations in which Article 31 extends to the civilian investigator," as follows:

(1) When the scope and character of the cooperative efforts demonstrate "that the two investigations merged into an indivisible entity," United States v. Swift, 17 USCMA 227, 232, 38 CMR 25 [, 30]; and (2) when the civilian investiga-

tor acts "in furtherance of any military investigation, or in any sense as an instrument of the military," United States v. Grisham, 4 USCMA 694, 697, 16 CMR 268 [, 271]; United States v. Aau, 12 USCMA 332, 30 CMR 332...

United States v. Penn, 18 USCMA at 199, 39 CMR at 199. Here, Mrs. Holmes in a very real and substantial sense acted as an instrument of the military.[2] See Mil. R. Evid. 305(b)(1).

In this regard, we first note that the organization which employed her and directed her actions was under the control of military authorities. In Standard Oil Co. v. Johnson, 316 U.S. 481, 485, 62 S.Ct. 1168, 1170, 86 L.Ed. 1611 (1942), the Supreme Court long ago recognized "that post exchanges...are arms of the government deemed by it essential for the performance of governmental functions. They are integral parts of the War Department, share in fulfilling the duties entrusted to it...." The control of the exchange lies with the post commander and applicable service regulations; its purpose "is to provide convenient and reliable sources where soldiers can obtain their ordinary needs at the lowest possible prices." Id. at 484–85, 62 S.Ct. at 1169–70. The same is substantially true today. See paras. 1–4 and 1–9, Army Regulation (AR) 60–10 (March 15, 1984). Accordingly, her position as a store detective at a base exchange was not private,[3] but governmental in nature and military in purpose. Contra United States v. Pansoy, 11 MJ 811, 813 (AFCMR 1981); United States v. Jones, 11 MJ 829, 831 (AFCMR 1981).

In addition, Mrs. Holmes' conduct in questioning appellant was at the behest of military authorities and in furtherance of their duty to investigate crime at base ex-

---

2. Whether an exchange detective is an investigative or law enforcement officer for purposes of 28 USC § 2680(h) is a considerably more narrow question than one posed for this review under Article 31, Uniform Code of Military Justice, 10 USC § 831. E.g., Solomon v. United States, 559 F. 2d 309 (5th Cir. 1977). See generally W. LaFave, Search and Seizure § 1.8 (2d ed. 1987).

3. Consequently, the reasons stated in the cases relied upon by the dissent for not requiring warnings from private security guards are inapplicable to this case. See In Re Deborah C., 30 Cal.3d 125, 177 Cal.Rptr. 852, 854, 635 P. 2d 446, 448 (1981); Metigoruk v. Municipality of Anchorage, 655 P.2d 1317 (Alaska App. 1982)

changes. *Cf. United States v. Aau, supra* at 336–37, 30 CMR at 336–37. Applicable service regulations make clear that the ultimate responsibility for prosecution of alleged criminal acts in base exchanges rests with military authorities. *See* para. 2–6(a)(8), AR 60–10. However, to assist the command in fulfilling this duty, the manager of the base exchange must file reports on crime including shoplifting with appropriate military officers.[4] Paras. 4–3, 4–4, 6–27, 14–3, Exchange Service Manual (ESM) 16–1 (June 1984). Moreover, the exchange detectives are particularly tasked with developing information for these reports and even detaining suspects without force for additional questioning by military police authorities. Mrs. Holmes obviously was not engaged in a frolic of her own.[5] *Cf. United States v. Volante,* 4 USCMA 689, 16 CMR 263 (1954).

We are also persuaded that appellant perceived that Mrs. Holmes' inquiries involved more than casual conversation. *See United States v. Duga,* 10 MJ 206. She stopped appellant, displayed her store credentials, and requested his identification card. Moreover, once her detective's badge was displayed, the detention and interrogation followed an official routine which was anything but casual. *See* paras. 6–29 to 6–32, ESM 16–1. In these circumstances, warnings were required by Article 31 if military authorities intended to use his responses as evidence at his court-martial. Art. 31(d).

In reaching this conclusion, we find of great significance that questioning of appellant did not occur at the original stop but after he was escorted to the manager's office by store employees. Furthermore, he was not simply asked to produce his receipt for the merchandise, a practice to which we have no objection on constitutional or codal grounds. *See United States v. Lee,* 25 MJ 457, 459 (CMA 1988). *See generally Doe v. United States,* —— U.S. ——, 108 S.Ct. 2341, 2347–48, 101 L.Ed.2d 184 (1988).

■ The final question we must address is whether appellant was prejudiced by the erroneous ruling of the military judge. *See* Art. 59(a), UCMJ, 10 USC § 859(a). His defense at trial was that a stranger had left the stolen items with him in the store and that he innocently left the store with them in the hope of returning them to this unknown person. Appellant's admissions to Mrs. Holmes that he had a receipt because he had purchased these items at the stereo counter earlier in the day doomed this defense. A rehearing is appropriate.[6]

The decision of the United States Army Court of Military Review is reversed; the findings of guilty and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge EVERETT concurs.

COX, Judge (dissenting):

The exclusionary rule created by Article 31(d), Uniform Code of Military Justice, 10

---

4. Mrs. Holmes testified that "the post commander has actually directed us that anytime we have a detention on the post, whether it's proven or not proven, we are to notify the security police."

5. The Exchange Service Manual 16–1 (Ch. 14, June 1984) states:

6–27. The responsibility for prosecution of suspected shoplifters rests with local military commanders. AAFES personnel will cooperate in any prosecution to the extent of providing testimonial/documentary evidence. Any participation beyond this limitation will be cleared first through the HQ AAFES General Counsel.

6–28. AAFES is not a law-enforcement or investigative agency, and no AAFES employee

should administer a Miranda-type advisement of rights in the course of duty. Detaining and discussions or confrontations with persons suspected of shoplifting will be done only by *activity managers, assistant managers, designated supervisors, safety and security specialists,* or *exchange detectives.* For the purpose of this chapter, "detention" means the delaying of a suspect's departure from the area concerned, *without force or coercion, by request or invitation.*

*Cf. United States v. Pansoy,* 11 MJ 811, 813 n.5 (AFCMR 1981).

6. The first issue need not be answered in view of our disposition of the specified issue.

USC § 831(d), was designed by Congress for the salutary purpose of protecting military personnel from "the effect of superior rank or official position" since "under certain circumstances" the effect of asking a question can be "the equivalent of a command" upon one subject to military law and accustomed to military discipline. *United States v. Gibson,* 3 USCMA 746, 752, 14 CMR 164, 170 (1954). Given this congressional backdrop, I do not see a compelling need to expand the exclusionary rule far beyond the boundaries envisioned either by Congress or the United States Supreme Court. Indeed, I can find no parallel in civilian or military law that would suppress or exclude statements made by an individual in response to a store security guard's inquiry at the store as to whether the individual had purchased a certain item there. When we set out to expand exclusionary rules, I feel we should at a minimum try to determine if a legitimate societal concern will thereby be alleviated. *See id.* at 752, 14 CMR at 170. Here, I do not need to take the rights provided under Article 31 to the doors of the post exchange.

Since Mrs. Holmes, a civilian employee of a nonappropriated fund instrumentality, is not a person subject to the Code, she would be required to give Article 31 warnings only if she were "acting as a knowing agent of a military unit or of a person subject to the code." Mil.R.Evid. 305(b)(1), Manual for Courts-Martial, United States, 1984. I cannot agree with the majority's characterization of this AAFES store detective "as an instrument of the military." See page 315.[1]

As a civilian employee of the post exchange, Mrs. Holmes' "mission" was to protect exchange property. Having no authority to forcibly detain a suspected shoplifter, coordination with the military law enforcement authorities on base is a given. There is no distinction between her position and that of any other private store detective, who, upon detecting a potential shoplifter, has to call in the local police for any processing which would lead to criminal prosecution. *See Metigoruk v. Municipality of Anchorage,* 655 P.2d 1317 (Alaska App. 1982) (J.C. Penney security guard not agent of city even though local police contacted for assistance)[2] *United States v. Antonelli,* 434 F.2d 335 (2d Cir. 1970) (primary task of pier security guards was to protect private property).

I fail to see that this coordination of necessity makes a post exchange store detective "a knowing agent" of the military, and I am not persuaded that the congressional purpose for enacting Article 31 is implicated in this case. *See United States v. Gibson, supra.*

Even if I were to agree with the majority opinion that Mrs. Holmes is a person required by Article 31 to give warnings, I would not require that she begin her inquiry of appellant with a warning, albeit she suspected him of shoplifting. To require Article 31 warnings in this non-custodial setting is to stretch these rights beyond the most liberal interpretation of the Code.

The majority opinion "find[s] of great significance that questioning of appellant

---

1. Regarding the majority's note 3, I am of the view that the Exchange Service is an instrument of the United States rather than an instrument of the military. Article 31 only applies to the latter. The majority opinion at 315 says the post commander controls the exchange. However, paragraph 1–8, AR 60–21, says it is the Commander, AAFES. Paragraph 1–6 of AR 60–21 says, "AAFES personnel are Federal employees of an instrumentality of the United States within DOD." That seems to settle the matter. *See generally* AR 60–21 on how AAFES employees fit into the federal system. They are treated differently from military personnel. *See* para. 1–7.

2. For a variety of reasons, state courts "generally have declined to extend" the requirements of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 691 (1966), "to privately employed" security personnel. *In re Deborah C.,* 30 Cal.3d 125, 177 Cal.Rptr. 852, 856 and n. 4, 635 P.2d 446, 450 and n.4 (1981), and cases cited therein (store detective's incentive to extract confessions is diminished even where primary intent is to prosecute, since they usually only detain customers who have actually been observed shoplifting); *see* 1 W. LaFave & J. Israel, *Criminal Procedure* § 6.10(b) at 541–42 (1984); *State v. Yates,* 357 So.2d 541 (La.1978) (Sears security guard's detention of suspect not "custody").

did not occur at the original stop but after he was escorted to the manager's office." See page 315. Under Article 31, custody is of no legal consequence. If it was wrong to ask him questions in the office, it was wrong to ask him questions at the door. However, where the questions are asked is not relevant under Article 31.

The majority states that they "have no objection on constitutional or codal grounds" to asking appellant "to produce his receipt." *Id.* These are the questions that the military judge permitted. *He excluded all other responses,* as is shown by the following colloquy:

Q What happened when you got back to Mr. Henry's office?

A When we got back to Mr. Henry's office Sherri Thuer and I entered along with Mr. Quillen and I asked him if he had a reciept for the merchandise. And he stated—he kind of started fondling into his pockets. He said, "No, I think I must have lost it. I was in here earlier today and purchased it then I come back and I was gonna exchange these blouses for my wife but they didn't have the correct size for me to change it out."

*   *   *   *   *   *

\* \* \* Q Did he then state where he purchased the VCR and Betamovie Camera?

A I asked him, I said, "Where did you purchase these at," referring to the Beta and the VCR, he said that he had paid for them over at the stereo counter. And I said, "Are you sure it was at the stereo? You didn't pay for them at central checkout, or you didn't pay for them back at the sporting goods?" And he said, "No. I bought them earlier over at the stereo counter." So I said, "Okay, thank you."

I conclude that the military judge correctly permitted this extremely limited testimony which even the majority would appear to allow if appellant had been "asked for his receipt" somewhere other than in Mr. Henry's office.

Lastly, the real irony of the case is that the questions were unnecessary to prove the shoplifting and the answers are clearly harmless beyond any reasonable doubt. See *United States v. Hallock,* 27 MJ 146 (CMA 1988) (no need to decide whether the investigating officer should have advised appellant of his rights under Article 31 because admission of the statements was harmless beyond a reasonable doubt).